UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

GAIL MILON

    Plaintiff,

v.

JASMINKA ILICH-ERNST

    Defendant.

_____/

CASE NO.

3:23-CV-642-BJD-PDB

## ACTION TO VACATE A FINRA ARBITRATION AWARD

The Plaintiff, Gail Milon (at times also referred to as the "Plaintiff" or "Milon") hereby submits an Action to Vacate a FINRA Arbitration Award (FINRA Arbitration Number 22-01266. See **Exhibit "A"**) awarded to Defendant Jasminka Ilich-Ernst (at times also referred to as "Defendant" or "Ilich-Ernst"), Pursuant to FINRA Rule 9554. This dispute involves a federal law. The reason for this action is misrepresentation and potential bias as described herein. The Plaintiff is filing this action Pro Se due to hardship.

### EXPLANATION

Defendant filed a Statement of Claim against Plaintiff on or about June 7, 2022 alleging: suitability; breach of regulatory requirements; breach of

1

fiduciary; negligence and gross negligence; breach of contract; selling away and fraud. See Exhibit **"B"**. The Plaintiff filed a Statement of Answer in defense to Defendant's Statement of Claim responding the allegations to be false and without merit. See **Exhibit "C"**. **For clarity purposes, the Plaintiff categorically denies any wrongdoing in this matter, and specifically states that Defendant is not entitled to any recovery in this matter.**

The Plaintiff submitted an ARBITRATION Submission Statement stating the loans in question pertain to loans between the Respondent and other parties, not the Plaintiff and the Plaintiff found herself in a position that she could not sign the FINRA ARBITRATION Submission Agreement. FINRA acknowledge receipt of the Plaintiff's ARBITRATION Submission Statement but noted the ARBITRATION Submission Statement cannot be accepted. See **Exhibit "D"**. The Plaintiff submitted a letter to the case administrator addressing her concerns: one being the appearance of an impartial person as an arbitrator, the second concern was what jurisdiction did FINRA have concerning the Plaintiff regarding contracts that were between parties other than the Plaintiff (attaching the contracts with the letter), the third concern was being told the arbitration would proceed with or without the Plaintiff. See **Exhibit "E"**. The Plaintiff's letter was not answered by

2

the FINRA case administrator but instead forwarded to the Arbitrator Chair, who appeared to be an impartial person, for a response. The Plaintiff called the case administrator because she had not received a response from him concerning her letter. The Plaintiff did not receive a returned call from the case administrator however, after being contacted by FINRA regarding another matter, the Plaintiff informed the FINRA representative she had not received a response to her letter and was eventually contacted by another case administrator with whom the Plaintiff verbally expressed her concerns, thinking the interim case administrator would address the impartial person concern. Nothing was done. The Plaintiff felt there was potential bias that was not addressed and did not participate in the arbitration. The arbitration WAS NOT a neutral playing field. The Plaintiff is requesting the case be reviewed by a Court of Law.

## STATEMENT OF FACTS

The Defendant was a professor with Florida State University (FSU). She remains an ISL Faculty Affiliate with her Fulbright Scholar Fellowship. The Plaintiff was the Defendant's advisor when she was licensed with MetLife. Upon the Plaintiff's departure with MetLife, the Defendant was transferred to another advisor. The Plaintiff had a two year non-compete clause with MetLife, therefore, the Plaintiff was not nor could not be the Defendant's advisor upon departing

MetLife. The Plaintiff was the Defendant's advisor for approximately sixteen years while at MetLife. The Defendant is also considered a friend of the Plaintiff.

The Plaintiff was introduced to Attorney Phillip Timothy Howard (at times also referred to as "Howard") through a previous client. A meeting was scheduled for the Plaintiff and Howard to meet. At that time, in addition to Howard having a law firm, Howard had several companies: Cambridge Graduate University International (at times also referred to as the "University") Cambridge Capital Group, LLC, Cambridge Capital Advisors, LLC, Cambridge Partners, LP, Cambridge Capital Group Equity Option Opportunities, LP, among others. The Plaintiff eventually met the individual who appeared to be running the Cambridge operations (except for the University). His name is Don Reinhard (at times also referred to as "Reinhard"). Reinhard was the former FSU Booster Chair. Howard gave the Plaintiff a tour of the operations and the Plaintiff was impressed with what she saw. The Plaintiff also met with Reinhard, and he provided additional details regarding the Cambridge operations.

The Plaintiff was introduced to the Broker Dealer Reinhard was working with, Ellis Liddell with ELE Wealth Management, LLC. After discussions with various individuals, the Plaintiff decided to leave her book of business she

spent years to build and join ELE Wealth Management (ELE). At the beginning, the Plaintiff was working with Don Reinhard. Shortly after joining ELE, Reinhard had a warrant out for his arrest. The Plaintiff was asked to help during this unfortunate event and updated her U-4 to reflect the outside business activity.

The Plaintiff didn't know if a letter went out to the Plaintiff's previous clients informing them of her departure from MetLife and announcing their new advisor or if previous clients saw someone else name as their advisor on their quarterly statements, the Plaintiff begin to receive phone calls from previous clients. The Plaintiff informed those who called what she was doing now. The Plaintiff believes the Defendant was one of those calls. The Defendant at that time was feeling the pressure from FSU to retire. The Plaintiff attempted to encourage the Defendant to stand up to FSU. Don't leave until she was ready to leave. Fight for what's right. When the Defendant was hired by FSU, she brought an award/grant with her. The funds had been depleted and now the pressure was on for her to retire. The Plaintiff informed the Defendant where she was and what she was doing now as well.

The individual that was running the University and Howard began to have some disagreements. Howard subsequently terminated the individual that was overseeing the University. Sometime later, Howard and his partner, Addys Walker

5

(at times also referred to as "Walker"), came into the Plaintiff's office and asked her to write a check for one hundred thousand ($100,000.00) to a title company as a retainer for the purchase of a property in Jacksonville, Florida. The Plaintiff was later told by Walker that Cambridge purchased the property and that the Plaintiff was to work with a mortgage broker by the name of Retina Moore with Coins 2 Capital to secure a construction loan for the Jacksonville property. During this process, Walker came into the Plaintiff's office and stated there was an opportunity for individuals to receive a twenty-five percent (25%) return on a short-term bridge loan and to call individuals that she thought may be interested in this opportunity.

The Plaintiff called the Defendant and told her about a potential opportunity within Cambridge Graduate University International as well as the short-term loan opportunity. The Defendant expressed an interest in meeting with Howard. The Plaintiff was not involved in the meeting the Defendant had with Howard. The Plaintiff did not recommend or advise the Defendant to enter a loan agreement with Howard. The Defendant made that decision on her own. AFTER the Defendant made the decision to enter a short-term bridge loan agreement with Howard, the Plaintiff was told to assist the Defendant with the

6

paperwork. The Defendant decided to provide Cambridge with two short-term loans, pursuant to the following documents:

A. Loan Agreement, dated August 24, 2017, wherein Claimant loaned Cambridge Capital Group and Cambridge Capital Partners $500,236.22 for a period of 60 days in exchange for a 25% interest payment; and

B. Laon Agreement dated December 12, 2017, wherein Claimant loaned Cambridge Capital Group and Cambridge Capital Partners $20,000.00 for a period of 31 days in exchange for a 25% interest payment. See **Exhibit "C"**. No qualified money was used.

The Defendant is not an investor in Cambridge. The Defendant is a creditor of Cambridge.

Walker was now running the Cambridge operations. Howard entered into a sale agreement of the Cambridge Entities with Walker in March of 2017, before the Plaintiff officially came on board. See **Exhibit "C"**. The Plaintiff IS NOT a partner of Howard or Walker. The Cambridge Entities were established in December of 2015.

The Plaintiff was not very knowledgeable about Howard's law firm operations and the other projects Howard and Walker were working on. Retina Moore and the Plaintiff secured a twenty-four million six hundred-thousand-

7

dollar ($24,600,000.00) construction loan for the Jacksonville project. When the Plaintiff requested the HUD 1 statement from Howard and Walker, neither could deliver. Howard and Walker were working on another project. Something went terribly wrong. That is when the Plaintiff found out Cambridge didn't own the Jacksonville property. Howard pulled out of whatever transaction he was working on and everything begin to collapse. Walker left, majority of the staff left, and the office went from 26 or more staff to 5.

    While the Plaintiff was working on the construction loan for the Jacksonville project, Howard and Walker were working on other aspects of the project, along with other projects. The Defendant's Bridge Loan Agreement was coming due. The Plaintiff called the Defendant to provide her with an update. Howard and Walker hadn't closed on the project they were working on, and the Plaintiff was told to ask the Defendant if the settlement could be moved into the following year. There was a Jacksonville project. The Plaintiff attached emails confirming such. See **Exhibit "C"**. To the best of the Plaintiff's knowledge funds are still pending regarding the Jacksonville project even though the building was imploded in March of 2022. The Plaintiff did not take advantage of the Defendant. The Defendant is a friend of the Plaintiff.

The Plaintiff was informed by Howard, Cambridge's position to purchase the Jacksonville property was taken over by another organization. Howard filed something with the court to protect Cambridge's investment in the Jacksonville project. The Plaintiff had seen Howard obtain resources when resources were needed. The Plaintiff was hoping that would transpire again. The Plaintiff was doing what she could to make that happen.

The SEC paid Howard and the Plaintiff a surprise visit. Howard did not speak with the SEC. He had sold the Cambridge Entities to Walker. Walker informed the SEC of that change in management. The SEC then asked to speak with the Plaintiff. As an active FINRA member, the Plaintiff is required to participate with the SEC. Walker escorted the Plaintiff out of the office and requested the SEC speak with Cambridge's attorney. The SEC called ELE Wealth Management. They asked Mr. Liddell about a new company, Cambridge Capital Partners Wealth Fund. When Mr. Liddell asked the Plaintiff about the new company, the Plaintiff was not aware of a new company. The Plaintiff asked Howard about the new company. The Plaintiff was told the name Cambridge Capital Partners was not available in the state of Nevada, so the name was changed to Cambridge Capital Partners Wealth Fund. No one felt it was important for the Plaintiff, who was an active licensed FINRA member at that time,

to know about the name change.

After numerous updates to the Defendant with no results, the Defendant filed suit against the Plaintiff, MetLife, and ELE Wealth Management in the year 2020. There were two mediations regarding the same matter. The first mediation agreement did not include Howard. The Defendant had filed a suit against Howard and Howard wanted to be included in the mediation. The Defendant filed a lawsuit against Howard in the District Court for the Northern District of Florida for RICO violations and fraud, among other things, in a case styled: Jasminka Illich-Ernst v. Phillip Timothy Howard, Case No. 4:19-cv-00554-RH-MJF, on November 12, 2019. The MEDIATED SETTLEMENT AGREEMENT AND RELEASE (was entered into between Jasminka Ilich-Ernst (the "Plaintiff) on the one hand, and Gail Milon, Phillip Timothy Howard, Howard & Associates, Attorneys at Law, P.A., Cambridge Capital Group Advisors, LLC, Cambridge Capital Advisors, LLC, Cambridge Capital Group, LLC, Cambridge Capital Partners, LLC (collectively Referred to as the "Cambridge Entities"), on the other hand (Plaintiff and the Cambridge Entities are collectively referred to as the "Parties". The Parties had two years to get the Defendant paid. Cases were settling, the suit with the Jacksonville project was/is still pending. The Plaintiff was sure the Defendant would be paid within the

two-year period. The Plaintiff did not see Cambridge going into receivership.

The Defendant continues to state the Plaintiff was her financial advisor at the time of this agreement with Howard. The Plaintiff WAS NOT the Defendant's financial advisor after separating with MetLife. The statements the Defendant attached in her supporting Exhibits DO NOT reflect the Plaintiff as the Defendant's advisor. None of the Defendant's supporting Exhibits identifies the Plaintiff. There is no evidence of the Plaintiff advising or recommending the Defendant enter into a loan agreement with Howard. That is because the Plaintiff did not advise or recommend the Defendant enter a loan agreement with Howard and his companies and the Plaintiff did not take the Defendant's money under false pretense. The Plaintiff was not paid significant monies and promised additional riches and the Plaintiff was not paid a renumeration regarding the loan agreements between the Defendant and Howard.

DEFENDANT'S CAUSES OF ACTION AGAINST PLAINTIFF

Defendant has alleged six causes of action against Plaintiff in her Statement of Claim. However, based upon the foregoing facts and has been demonstrated with supporting detail, Defendant is not entitled to recover under any cause of action as to the Plaintiff for the following reasons:

A. Defendant's first cause of action is for "Suitability". Plaintiff did not recommend any investment to Defendant. Accordingly, Defendant will not be able to demonstrate any "unsuitable investment recommendation" to Defendant and the cause of action must fail.

B. Defendant's second cause of action is for "Breach of Regulatory Requirements". In support of such cause of action, Defendant has alleged that Plaintiff violated Sections 2010, 2090, and 2111 of FINRA's Conduct Rules. Defendant's second cause of action is misguided because it is well-established that no private right of action exists for an alleged violation of FINRA rules. Moreover, none of the Plaintiff's conduct at issue in this matter violated any FINRA rule. Accordingly, this cause of action must fail.

C. Defendant's third cause of action is for "Breach of Fiduciary Duty." Defendant's third cause of action is misguided because no fiduciary relationship existed between Defendant and Plaintiff at the time of the loans that form the basis for this matter. Although Defendant was a previous customer of Plaintiff, that customer relationship had extinguished by the time Defendant engaged in the loans in question. In

the demonstrated absence of a fiduciary relationship between Defendant and Plaintiff, this cause of action must fail.

D. Defendant's fourth cause of action is for "Negligence and Gross Negligence." Regardless of Defendant's unsupported and conclusory allegations, Plaintiff breached no duty to Defendant by introducing Defendant to the opportunity to loan funds for a short-term with an attractive rate of return. Coupling such lack of duty with a complete absence of any "investment" or "investment strategy" renders this cause of action without merit and subject to failure.

E. Defendant's fifth cause of action is for "Breach of Contract." Simply put, Defendant has not alleged – and will be unable to identify – any contract with Plaintiff in connection with this matter. Since Defendant had no contract with Plaintiff, this cause of action must fail.

F. Defendant's sixth cause of action is for "Selling Away and Fraud." "Selling away" is a term used in connection with private securities transactions and FINRA's oversight thereof. Aside from the inconvenient fact (for Defendant) that no private right of action exists for a violation of FINRA rules, Plaintiff's conduct at issue in this matter did not violate any FINRA rule because she did not engage in any private securities

transaction since the short-term loans at issue are not securities. Those two deficiencies are fatal for this cause of action, and doom it to failure. "Fraud" is a term used in the securities industry characterized by the misrepresentation or omission of material information to investors in during the purchase or sale of securities. Plaintiff did not engage in any securities transaction since the short-term loans at issue are not securities. Supporting documentation reflects the loan attempt and makes the fraud allegation baseless.

## AFFIRMATIVE DEFENSES

Ms. Milon respectively asserts the following Affirmative Defenses in response to the allegations contained in the Defendant's Statement of Claim:

A. Defendant has failed to state any claim upon which any relief can be granted;

B. Defendant's claims are barred, in whole or in part, by the doctrine of comparative negligence;

C. No private right of action exists for alleged violations of FINRA rules;

D. No securities transactions or investments are at issue in this matter, such that the federal securities laws, rules, and regulations are not applicable in

this matter;

E. Ms. Milon, at all times, interacted with Defendant properly and in good faith;

and

F. Defendant's damages, if any, were not caused by acts attributable to Ms. Milon.

WHEREFORE, for the reasons discussed above, Ms. Milon respectfully request the Court Vacate this FINRA Arbitration Award in its entirety including any and all cost and fees incurred, in defending this frivolous matter.

All exhibits submitted by Defendant can be found under **Exhibit "F"**. All additional documents received or submitted during the FINRA arbitration by all parties involved in the arbitration can be found under **Exhibit "G"** in order by date. Please NOTE, there may be duplicates of Exhibits.

**UNDER PENALTY OF PERJURY, I SWEAR OR AFFIRM THAT I BELIEVE THE FACTS I HAVE STATED ARE TRUE.**

_____        May 30, 2023
Gail Milon                              _____
                                        Date

1432 Denholm Drive                      850-591-4010
_____         _____
Address                                 Telephone

Tallahassee, Florida 32308                                       gail.milon@gmail.com
_____                                      _____
City, State, Zip Code                                            Email

## CERTIFICATE OF SERVICE

I certify that copy of hereof has been furnished to Scott L. Silver On Behalf Of:

Jasminka Ilich-Ernst by U.S. mail this 30th day of May 2023.

*Gail Milon*
Gail Milon